**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> -against- <br><br> ALP SUPPLY INC, PAL VAKULA, JOHN DOES 1 THROUGH 5, AND ABC CORPORATIONS 1 THROUGH 5, <br><br> Defendants. | CIVIL ACTION <br><br> 21-CV-3536 (AMD)(RER) <br><br> COMPLAINT <br><br> (TRIAL BY JURY DEMANDED) |

-------------------------------------------------------------------------

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company (collectively "**Plaintiffs**" or "**Allstate**"), by their attorneys, Morrison Mahoney, LLP, for their Complaint against Defendants Pal Vakula ("Vakula"), ALP Supply Inc ("ALP Supply") (Vakula and ALP Supply are collectively referred to as "**Retail Defendants**"), John Does 1 through 5, (collectively "**Wholesale Owners**"), and ABC Corporations 1 through 5 (collectively "**Wholesalers**"; Wholesalers and Wholesale Owners are collectively referred to as "**Wholesale Defendants**"), (collectively the Retail Defendants and Wholesale Defendants are referred to herein as "**Defendants**") allege as follows:

## PRELIMINARY STATEMENT

1. On information and belief, from at least August 2019 and continuing through the date of the filing of this Complaint, Defendants engaged in a scheme to defraud automobile insurance companies, including Plaintiffs, through New York State's No-fault system.

2. This action seeks to recover more than $53,600.00 that Defendants stole from Plaintiffs through the submission of thousands of false and/or fraudulent insurance claims for durable medical equipment ("DME") and/or orthotic devices. As used herein, (i) "DME" generally

refers to equipment and/or supplies used for medical purposes by individuals in their homes, including, among other things, cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, hot/cold packs, infrared heat lamps, lumbar cushions, massagers, mattresses and whirlpools; and (ii) "orthotic devices" generally refers to items that are used to support a weak or deformed body member or to restrict or eliminate movement for medical purposes.  Such items include, but are not limited to, back braces, cervical collars, knee braces, shoulder braces and wrist braces.

3.     At all relevant times mentioned herein, each and every DME and/or orthotic device supplied by ALP Supply was provided pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as defined below.

4.     To execute the scheme to defraud alleged herein, Vakula, through ALP Supply, entered into arrangements with one or more of the Wholesale Defendants, and one or more medical clinics operating in the New York metropolitan area that bills No-fault insurers for medical services (hereinafter "No-fault Clinics").

5.     On information and belief, pursuant to these arrangements and in exchange for kickbacks and/or other financial compensation, the managers, owners and/or controllers of No-fault Clinics, which are not named as defendants in this action, facilitated the scheme in several ways, including but not limited to:

(i) ensuring that their associated doctors and/or chiropractors (hereinafter "Health Care Practitioners" or "HCPs") prescribed large amounts of virtually identical DME and/or orthotic devices to their patient population, pursuant to a predetermined course of treatment irrespective of medical necessity, with the prescribed items being dictated by ALP Supply;

2

(ii) fabricating and/or falsifying DME prescriptions by:

(a) utilizing blank prescription forms signed by their HCPs in order to unilaterally fill in the prescription with expensive and unnecessary DME and/or orthotic devices;

(b) duplicating and/or photocopying the HCPs' signatures onto new prescription forms, which the Clinic would then fill in with expensive and unnecessary DME and/or orthotic devices; and

(c) fraudulently altering otherwise valid prescriptions issued by their HCPs by adding or changing the DME and/or orthotic device(s) prescribed in order to conform the prescription to a pre-determined protocol designed to maximize reimbursement by insurance companies; and

(iii) ensuring that the prescriptions were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone.

6.     The use of generic descriptions in the fraudulent prescriptions enabled the Retail Defendants to: (i) misrepresent the nature and quality of the DME and/or orthotic devices prescribed to the patient, if any items were legitimately prescribed at all; (ii) misrepresent the nature and quality of the items that were dispensed to the patient, if any items were dispensed at all; and (iii) fraudulently bill for products that would result in the highest forms of reimbursement from insurers, in general, and Plaintiffs, in particular.

7.     Pursuant to the fraudulent prescriptions, ALP Supply routinely provided (or purported to provide) a nearly identical battery of DME and/or orthotic devices to persons injured in automobile accidents insured by Plaintiffs (hereinafter "Claimants" or "No-fault Claimants"), regardless of medical necessity, in order to maximize reimbursement from insurers in general, and Plaintiffs in particular.

8.     On information and belief, the Retail Defendants then paid kickbacks or other forms of compensation to the No-fault Clinics for the fraudulent prescriptions, which were transmitted directly by the Clinics to the Retail Defendants to support their claims for reimbursement.

9.      On information and belief, in many instances, Vakula submitted to Plaintiffs, through ALP Supply, prescription forms which they knew to be fabricated and/or fraudulently altered and/or duplicated, in order to misrepresent the number and/or quality of DME and/or orthotic devices actually prescribed by the No-fault Clinics' HCPs, if any were prescribed at all.

10.     On information and belief, pursuant to similar agreements, and in exchange for kickbacks and/or other financial compensation, including, but not limited to, a share in the profits of the scheme to defraud, the Wholesale Defendants provided ALP Supply with inexpensive DME and/or orthotic devices, along with fraudulent wholesale invoices that grossly inflated the amounts ALP Supply paid for the DME and/or orthotic devices. Other times, one or more Wholesale Defendants provided ALP Supply with fraudulent wholesale invoices that reflected DME and/or orthotic devices that were never actually provided to ALP Supply.  In fact, irrespective of whether any DME and/or orthotic devices were actually provided to ALP Supply, the wholesale invoices typically reflected prices that exceeded 10 times the actual prices that ALP Supply paid to the Wholesale Defendants and/or were sufficiently generic and devoid of detail to allow ALP Supply to seek reimbursement for expensive, complex DME when simple and/or counterfeit DME was provided.

11.     On information and belief, in some instances, to create the illusion that ALP Supply paid the grossly inflated prices on the wholesale invoices, as more fully alleged in the "Money Laundering Scheme" section below, ALP Supply issued checks to the Wholesale Defendants for the full amounts reflected on the wholesale invoices. ALP Supply then used those checks to demonstrate to Plaintiffs, and others, that they had paid the false wholesale invoice amounts. In reality, the Wholesale Defendants converted the checks they received from ALP Supply to cash and secretly returned to ALP Supply a portion of the profits of the scheme through kickbacks or

other financial compensation. These covert cash transactions were facilitated through various clandestine arrangements among ALP Supply, the Wholesale Defendants, check brokers, check cashers and/or others unknown to Plaintiffs.

12.     On information and belief, through these transactions, ALP Supply was able to surreptitiously obtain cash, which then was used for, among other things, kickbacks to the No-fault Clinics from which ALP Supply received fraudulent prescriptions for DME and/or orthotic devices.

13.     On information and belief, in other instances, Vakula, through ALP Supply, purchased inexpensive DME and/or orthotic devices from wholesalers not named as defendants herein that were counterfeit or knockoffs of trademarked items made by other manufacturers. At all relevant times mentioned herein, ALP Supply knew that it could purchase the counterfeit items at a fraction of the cost of the actual, trademarked items and bill for such items under expensive codes for complex DME when, in fact, the items were cheaply manufactured.

14.     On information and belief, in furtherance of the scheme to defraud alleged herein, ALP Supply purchased the cheap DME and/or orthotic devices in bulk and routinely misrepresented the nature, quality and cost of the items in order to fraudulently obtain and maximize their reimbursement far in excess of the amounts it was entitled to receive under the No-fault Law.

15.     After obtaining the fraudulent prescriptions from the No-fault Clinics and the inflated invoices from the Wholesale Defendants and/or counterfeit DME from the non-party wholesalers and suppliers, Vakula, through ALP Supply, generated and submitted bills to Plaintiffs, among others, knowingly misrepresenting the actual amounts they paid for the DME and/or orthotic devices, as well as the nature and quality of the items, and the medical necessity of the purportedly prescribed DME and/or orthotics.

16.     In order to prevent Plaintiffs from determining the appropriate charges associated with any such DME and/or orthotic device, or whether the specific DME and/or orthotic device billed for was medically necessary, the documents submitted to Plaintiffs by Vakula through ALP Supply in support of their fraudulent claims, including the wholesale invoices, deliberately omitted and/or misrepresented basic information about the DME and/or orthotic devices, including, but not limited to, the manufacturer, make, model, size, features and/or functions of the item and/or included information that was meaningless in determining the kind and quality of any specific DME and/or orthotic device.

17.     On information and belief, Vakula, through ALP Supply, routinely purchased basic, low-quality and inexpensive items from the Wholesale Defendants or other suppliers, but submitted documents, including, but not limited to, in some instances, inflated wholesale invoices, to insurers, including Plaintiffs, that failed to accurately reflect the actual nature, quality, and purchase price of each item.

18.     On information and belief, in support of their claims for reimbursement, and to facilitate the fraud described herein, Vakula, through ALP Supply, generated delivery receipts that included a space for the patient's signature to document receipt of each item for which Vakula, through ALP Supply, billed Plaintiffs.

19.     On information and belief, often pursuant to agreements between the Retailer Defendants and the No-fault Clinics, patients were directed to sign these delivery receipts upon presenting to the No-fault Clinics, irrespective of whether any DME and/or orthotic devices were provided to the patient at that time. The Retail Defendants then submitted to Plaintiffs the signed delivery receipts as purported evidence of DME and/or orthotic devices allegedly supplied to a patient, when, in fact, no DME or orthotic device was ever supplied to the patient.

20.     In order to execute the scheme to defraud, at all relevant times mentioned herein, on information and belief, Vakula, through ALP Supply, engaged in one or more of the following: (i) paying kickbacks or other financial compensation to No-fault Clinics in exchange for fraudulent prescriptions of DME and/or orthotic devices; (ii) obtaining prescriptions that were provided pursuant to a predetermined course of treatment as opposed to medical need; (iii) obtaining and submitting to insurers, in general, and Plaintiffs, in particular, prescriptions which they knew to be fabricated and/or fraudulently altered/duplicated; (iv) paying fees to one or more Wholesale Defendants in exchange for fraudulent wholesale invoices that ALP Supply, in turn, would use to substantiate bogus claims for reimbursement of No-fault benefits; (v) arranging for the No-fault Clinics to have assignments of benefits and acknowledgement of delivery of receipt forms pre-signed by Claimants to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiffs, in particular, and (vi) systematically submitting bills to insurers, in general, and Plaintiffs, in particular, for DME and/or orthotic devices that Vakula, through ALP Supply, determined should be prescribed by the No-fault Clinics, with virtually every claimant receiving substantially similar DME and/or orthotic devices.

21.     At all relevant times mentioned herein, each and every bill and supporting documentation submitted by ALP Supply contained the same or similar false representations of material facts, including, but not limited to one or more of the following: (i) false and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants; (ii) false and misleading statements as to the amounts ALP Supply was entitled to be reimbursed under the No-fault Law; (iii) false and misleading statements that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants; (iv) false and misleading prescriptions for the DME and/or orthotic devices purportedly

supplied to No-fault Claimants, which generically described the item(s) in order to conceal the nature, type, and quality of item(s) being prescribed and/or provided; and (v) fabricated, false and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the DME and/or orthotic devices either were not prescribed as alleged, or were prescribed and supplied pursuant to a pre-determined, fraudulent protocol, whereby ALP Supply paid kickbacks to No-fault Clinics to induce the No-fault Clinics to provide fraudulent and fabricated prescriptions for large amounts of substantially similar, medically unnecessary DME and/or orthotic devices.  On information and belief, all of foregoing was intended to manipulate the payment formulas under the No-fault Law in order to maximize the charges that ALP Supply could submit to Plaintiffs and other insurers under the No-fault Law.

22.     In carrying out the scheme to defraud, Defendants stole in excess of $98,693.39 from Plaintiffs by submitting, causing to be submitted or facilitating the submission of fraudulent claims for persons who allegedly sustained injuries covered by the New York State Comprehensive Motor Vehicle Insurance Reparations Act, Ins. Law §§ 5101, *et seq*. (popularly known as the "No-fault Law").

## STATUTORY/REGULATORY SCHEME

23.     Pursuant to the No-fault Law, Plaintiffs are required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles or pedestrians, which arise from the use or operation of such motor vehicles in the State of New York.  Claimants can also assign these benefits to doctors and other properly licensed healthcare providers, including DME retailers, enabling them to bill insurance companies directly for their services.

24.     As alleged herein, Defendants exploited and continue to exploit this system by obtaining such assignments and billing Plaintiffs for DME and/or orthotic devices that were never provided, not provided as billed or, if provided, were of inferior quality relative to what was represented to have been provided in the bills submitted to Plaintiffs, and/or were otherwise medically unnecessary and provided pursuant to fraudulent prescriptions in conformity with a predetermined course of treatment in which virtually all Claimants received substantially similar DME and/or orthotic devices.  Exhibit "1" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs to ALP Supply for medical equipment and/or other services provided pursuant to fraudulent prescriptions based upon a predetermined course of treatment, irrespective of medical necessity.

25.     ALP Supply is ostensibly a DME supply company that bills for medical supplies provided to, among others, individuals covered under the No-fault Law.  In exchange for its services, ALP Supply accepted (and continues to accept) assignments of benefits from Claimants and submitted (and continues to submit) claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

26.     In accordance with the No-fault Law and 11 N.Y.C.R.R. §§ 65 *et seq*., ALP Supply submitted (and continues to submit) bills for its claims to Plaintiffs using the claim form prescribed by the New York State Department of Financial Services ("DFS," f/k/a the Department of Insurance), known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NYS form NF-3" (hereinafter "NF-3"), or a substantially similar form.

27.     At all relevant times mentioned herein, pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiffs by ALP Supply contained the following warning at the foot of the page:

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime….

28. At all relevant times mentioned herein, pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs were (and are) required to promptly process claims within 30 days of receipt of proof of claim.

29. At all relevant times mentioned herein, Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a DME provider, may recover for health service related expenses. In particular, under this section, such persons are only entitled to reimbursement of necessary medically related expenses in accordance with the applicable fee schedules established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the DFS.

30. At all relevant times mentioned herein, pursuant to Ins. Law § 5108, the Superintendent of the DFS adopted, by promulgation of Regulation 83, the Workers' Compensation Board ("WCB") Fee Schedules for determining the maximum permissible reimbursement amounts for which health care providers may charge for services provided to Claimants under the No-fault law. 11 N.Y.C.R.R. § 68.1.

31. Effective July 11, 2007, and through all relevant times mentioned herein, the WCB established a fee schedule for DME and orthotic devices, which adopts the New York State Medicaid fee schedule for durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances (hereinafter the "Fee Schedule"). 12 N.Y.C.R.R. § 442.2(a). The Fee Schedule was, and is, in effect at all relevant times mentioned herein.

32.     At all relevant times mentioned herein, with respect to items that are not on the Fee Schedule (hereinafter "Non-Fee Schedule" items ), the regulations further provide:

> [I]f the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.

*Id.*

33.     Accordingly, at all relevant times mentioned herein, providers of DME are entitled to reimbursement in the amounts set forth in the Fee Schedule.  At all relevant times mentioned herein, for Non-Fee Schedule items, the provider is only entitled to reimbursement in an amount equal to the *lesser* of either: (i) the net acquisition cost of the medical equipment to the provider, plus 50%, or (ii) the usual and customary price charged to the public. 11 N.Y.C.R.R. § 68.1; 12 N.Y.C.R.R. § 442.2(a).

34.     At all relevant times mentioned herein, pursuant to Section 5108(c) of the No-fault Law, "no provider of health services . . . may demand or request any payment in addition to the charges authorized pursuant to this section."

35.     Moreover, at all relevant times mentioned herein, to be eligible for reimbursement under the No-fault law, all claims for reimbursement must include a description of the "full particulars of the nature and extent of the . . . treatment received," including DME. *See* 11 N.Y.C.R.R. § 65-1.1.

36.     At all relevant times mentioned herein, nearly each and every bill mailed to Plaintiffs by Vakula, through ALP Supply, sought reimbursement in excess of the amounts authorized by the No-fault Law, by materially misrepresenting the DME and/or orthotic devices

provided, if provided at all, as well as the cost, quality, and medical necessity of the billed-for DME and/or orthotic devices.  To the extent the DME and/or orthotic devices were provided at all, each item was a basic, low-quality piece of medical equipment for which the proper reimbursement amount, if reimbursable at all, was a mere fraction of the amount they charged Plaintiffs, and/or was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

37.     At all times relevant herein, the Defendants exploited the No-fault Law through the utilization of various deceptive and identical billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular, through the submission of fraudulent billing documents that misrepresented the nature, quality and cost of items that both are and are not listed on the relevant fee schedule ("Fee Schedule items" and "Non-Fee Schedule items," respectively) purportedly provided to Claimants.

38.     As set forth in the "Non-Fee Schedule Scheme to Defraud" below, Vakula, through ALP Supply, routinely submitted bills to Plaintiffs for Non-Fee Schedule items wherein ALP Supply misrepresented that (i) the DME and/or orthotic devices purportedly provided were reimbursable under the relevant Fee Schedule in existence at the time, when, in fact, ALP Supply was utilizing codes that were not recognized by, or otherwise listed in, the relevant Fee Schedule ("phantom codes"); (ii) the charges reflected on ALP Supply's bills were in accordance with 12 N.Y.C.R.R. § 442.2, when, in fact, the charges were grossly inflated; and/or (iii) the DME and/or orthotic devices purportedly provided were reimbursable pursuant to the Fee Schedule, when they were not.  In doing so, Vakula, as described in the "Non-Fee Schedule Scheme to Defraud" section below, through ALP Supply, deliberately misrepresented the amounts that they were entitled to receive under the No-fault Law.

39.     In addition, as set forth in the "Fee Schedule Scheme to Defraud" section below, Vakula, through ALP Supply, also routinely submitted fraudulent bills to Plaintiffs for DME and/or orthotic devices that were never provided, including, but not limited to, expensive custom-fabricated or custom-fit DME and/or orthotic devices.

40.     On information and belief, ALP Supply and the Wholesalers alike were created for the purpose of participating in the fraudulent billing of insurance companies under the No-fault Law.

41.     On information and belief, every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, who, to the extent that they provided any DME and/or orthotic devices at all, provided No-fault Claimants with inferior, low-quality items, or items that directly contravened the treatment plan indicated by the treating physicians, potentially compromising patients' health.

42.     The duration, scope and nature of the Defendants' illegal conduct bring this case well within the realm of criminal conduct to which the Racketeer Influenced and Corrupt Organizations Act ("RICO") applies. Defendants did not engage in sporadic acts of fraud—although that would be troubling enough—rather, they adopted a business plan and used it to participate in systematic patterns of racketeering activity.  Every facet of Defendants' operations, from securing fraudulent prescriptions for DME and/or orthotic devices pursuant to a predetermined course of treatment, to obtaining inflated wholesale invoices for inexpensive, low quality items, to generating bills that contained codes not recognized under the Fee Schedule in existence at the time, or that misrepresented the nature, quality and cost of DME and/or orthotic devices purportedly provided, was carried out for the purpose of committing fraud.

43.     This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to legitimate insurance claims for DME and/or orthotic devices.  In doing so, Plaintiffs seek compensatory damages and declaratory relief that Plaintiffs are not required to pay any of the Retail Defendants' No-fault claims because Vakula, through ALP Supply, submitted (1) false and fraudulent insurance claims to Plaintiffs deliberately misrepresenting the amounts they were entitled to be reimbursed; and/or (2) false and fraudulent insurance claims to Plaintiffs for DME and/or orthotic devices the Retail Defendants never actually supplied to No-fault Claimants.  Such claims continue to be submitted by and/or in the name of ALP Supply and are, or can be, the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus, constitute a continuing harm to Plaintiffs.

44.     By way of example and not limitation, Exhibit "2" in the accompanying Compendium of Exhibits is a spreadsheet listing in excess of $94,500.00 in unpaid No-fault claims that form the basis of Plaintiffs' request for declaratory relief.  Said spreadsheet is grouped by claim number, date of service and the amount billed.

## **NATURE OF THE ACTION**

45.     This action is brought pursuant to:

i)      The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. §§ 1961, 1962(c) and 1964(c);

ii)     New York State common law; and

iii)    the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

## NATURE OF RELIEF SOUGHT

46.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs seek treble damages, which they sustained as a result of the Defendants' schemes to defraud and acts of mail fraud in connection with their use of the facilities of the No-fault system to fraudulently obtain payments from Plaintiffs for DME and/or orthotic devices they allegedly provided to individuals covered by Plaintiffs under New York State's No-fault Law.

47.     Plaintiffs further seek a judgment declaring that they are under no obligation to pay any of ALP Supply's unpaid No-fault claims because:

>    i)     The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible amount they could submit to Plaintiffs; and
>
>    ii)    The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME and/or orthotic devices that they never supplied to No-fault Claimants.

48.     As a result of Defendants' actions alleged herein, Plaintiffs were defrauded of an amount in excess of $53,600.00, the exact amount to be determined at trial, in payments which Defendants received for fraudulently billing Plaintiffs for DME and/or orthotic devices that were never provided or, if provided, not provided as billed and/or provided pursuant to fraudulent prescriptions in accordance with a predetermined course of treatment, irrespective of medical need.

## THE PARTIES

**A.     Plaintiffs**

49.     Plaintiff Allstate Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

50.     Plaintiff Allstate Fire and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

51.     Plaintiff Allstate Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

52.     Plaintiff Allstate Property and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

53.     Plaintiffs are duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York and provide automobile insurance coverage to their policyholders under and in accordance with New York State law.

**B.**     **Retail Defendants**

54.     Pal Vakula ("Vakula") is a natural person residing in the State of New York, is the principal, officer, and/or director of ALP Supply Inc and, at all times relevant herein, operated, managed, and/or controlled its activities.

55.     ALP Supply Inc ("ALP Supply") was incorporated on or about July 23, 2019, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 2851 Cropsey Avenue, Brooklyn, NY 11214.  ALP Supply is operated, managed, and/or controlled by Defendant Vakula and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

C.      **The John Doe Defendants**

56.     On information and belief, John Does 1 through 5 are the principals, officers, and/or directors of the ABC Corporations 1 through 5.  On information and belief, John Doe Defendants 1 through 5, through the ABC Corporations 1 through 5, entered into kickback and/or other financial compensation agreements with ALP Supply to provide inexpensive DME and/or orthotic devices and fraudulent wholesale invoices that enabled ALP Supply to fraudulently bill Plaintiffs. These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

D.      **The ABC Corporations**

57.     On information and belief, the ABC Corporations 1 through 5 are additional corporations that purport to be wholesale DME supply companies that supply ALP Supply with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to ALP Supply.  These wholesale invoices: (i) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (ii) intentionally omit any model number, make, manufacturer or other identifiable information so that ALP Supply can, in turn, submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.  These ABC Corporations 1 through 5 will be added as defendants when their names and the full extent of their participation become known through discovery.

## JURISDICTION AND VENUE

58.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. because they arise under the laws of the United States.

59.     This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § l332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

60.     This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

61.     Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

62.     Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Eastern District of New York is the district where one or more the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL BACKGROUND AND ALLEGATIONS
## APPLICABLE TO ALL CAUSES OF ACTION

63.     Plaintiffs underwrite automobile insurance in New York State.

64.     As set forth in the Statutory/Regulatory Scheme section above, pursuant to the No-fault Law, Plaintiffs are required to pay for, *inter alia*, health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians that arise from the use or operation of such motor vehicles in the State of New York.

65.     On information and belief, ALP Supply is ostensibly a DME supply company that bills for medical supplies provided to, among others, individuals covered under the No-fault Law. In exchange for its services, ALP Supply accepts assignments of benefits from the Claimants covered under the No-fault Law and submit claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

66. To process and verify the claims submitted by ALP Supply, Plaintiffs required, and ALP Supply submitted, prescriptions and other documents relating to the DME and/or orthotic devices allegedly supplied to No-fault Claimants for which ALP Supply was seeking reimbursement from Plaintiffs.

67. In nearly all instances, the prescriptions submitted in support of the ALP Supply's claims for reimbursement were fraudulent, fabricated, and/or issued pursuant to a pre-determined treatment protocol, regardless of medical necessity.

68. In certain instances, ALP Supply submitted wholesale invoices to Plaintiffs in support of their claims for reimbursement, which reflected inflated prices well in excess of what ALP Supply actually paid, if anything, for the DME and/or orthotic devices purportedly purchased from the Wholesaler.

69. Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are required to promptly process ALP Supply's claims within 30 days of receipt of proof of claim.

70. To fulfill their obligation to promptly process claims, Plaintiffs justifiably relied upon the bills and documentation submitted by ALP Supply in support of their claims, and paid ALP Supply based on the representations and information contained in the bills and documentation that Defendants mailed to Plaintiffs.

71. At all relevant times mentioned herein, the No-fault law provides that the maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the relevant fee schedule established by the Worker's Compensation Board, as adopted by the Superintendent of the DFS. N.Y. Ins. Law § 5108; 11 N.Y.C.R.R. 68.1(a). For DME and orthotic

devices, the Worker's Compensation Board has adopted the fee schedule set by the New York State Medicaid program at the time such equipment and supplies are provided. 12 N.Y.C.R.R. § 442.2.

72. At all relevant times mentioned herein, with respect to DME and/or medical supplies for which the New York State Medicaid program has not established a fee ("Non-Fee Schedule Items"), the regulation provides that the fee payable shall be the lesser of:

    (1) the acquisition cost (*i.e.*, the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent; or

    (2) the usual and customary price charged to the general public.

12 N.Y.C.R.R § 442.2.

73. On information and belief, ALP Supply was created as the centerpiece of an elaborate scheme to fraudulently bill No-fault insurance carriers for DME and/or orthotic devices that were never provided, were not provided as billed or, if provided, were either of inferior quality relative to what was included in the bills submitted to Plaintiffs, and/or were otherwise medically unnecessary and provided pursuant to a predetermined course of treatment in which virtually all No-fault Claimants received the same or similar battery of DME and/or orthotic devices.

74. The DME and/or orthotic devices that ALP Supply purported to provide, and for which it billed Plaintiffs, seldom varied from patient-to-patient over a given period of time and also did not change based on any differences in the patients' condition, age, complaints, type of accident, or nature of alleged injury. Instead, Vakula, through ALP Supply, created a billing apparatus implementing a pre-determined treatment protocol that was designed to drain the maximum amount of dollars from insurance companies for each and every patient, including those who required little or no DME at all.

75.     On information and belief, Vakula created and controlled ALP Supply, as part of a well-organized illegal enterprise that engaged in systematic and pervasive fraudulent practices that distinguished it from legitimate providers of DME and/or orthotic devices.  The components of this enterprise followed practices that were part of a racketeering scheme dictated by Vakula, including, but not limited to, the one of more of the following practices:

- Unlike legitimate retail DME companies, Vakula, through ALP Supply, misrepresented the nature, quality and cost of DME and/or orthotic devices purportedly provided to No-fault Claimants;

- Unlike legitimate retail DME companies, Vakula, through ALP Supply, submitted bills to Plaintiffs misrepresenting the amounts they were entitled to be reimbursed under the No-fault Law;

- Unlike legitimate retail DME companies, Vakula, through ALP Supply, submitted bills to Plaintiffs for DME and/or orthotic devices that were never provided to No-fault Claimants;

- Unlike legitimate retail DME companies, Vakula, through ALP Supply, misrepresented the wholesale costs and/or usual and customary price of the Non-fee Schedule items purportedly supplied to No-fault Claimants;

- Unlike legitimate retail DME companies, Vakula, through ALP Supply, submitted wholesale invoices to Plaintiffs as part of their proof of claim, which systematically failed to provide a meaningful description of the DME and/or orthotic devices purportedly provided (*i.e.*, make and model) and/or additional information that is necessary to determine whether the charges submitted are legitimate;

- Unlike legitimate retail DME companies, Vakula, through ALP Supply, submitted wholesale invoices to Plaintiffs containing generic item descriptions, concealing the manufacturer, make, model, size and quality of the DME and/or orthotic devices purportedly supplied;

- Unlike legitimate retail DME companies, Vakula, through ALP Supply, submitted bills to Plaintiffs reflecting prices far in excess of those actually paid, concealing that the items actually supplied were far less expensive than the amounts indicated in the wholesale invoice for any particular item;

- Unlike legitimate retail DME companies, Vakula, through ALP Supply, submitted prescriptions, bills, and delivery receipts to Plaintiffs for DME and/or orthotic devices that generically described the item(s) so as to conceal the type of item(s) being prescribed and/or provided;

- Unlike legitimate retail DME companies, Vakula, through ALP Supply, concealed the fact that the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol pursuant to a kickback or other financial arrangement with No-fault Clinics;

- Unlike legitimate retail DME companies, Vakula, through ALP Supply, concealed the fact that the prescription forms submitted in support of their claims for reimbursement were fabricated and/or fraudulently altered/duplicated in order to maximize reimbursement regardless of medical necessity;

- Unlike legitimate retail DME companies, Vakula, through ALP Supply, and/or those acting under their direction and control, had agreements and/or understandings as to what generic DME and/or orthotic devices would be prescribed by the No-fault Clinics;

- Unlike legitimate retail DME companies, Vakula, through ALP Supply, arranged for the generic language on the prescription forms in order to unilaterally determine the DME and/or orthotic devices to be provided to patients and billed to insurers, in general, and Allstate in particular;

- Unlike legitimate retail DME companies, Vakula, through ALP Supply, arranged to have prescriptions for DME and/or orthotic devices delivered to them directly by the No-fault Clinics, rather than allowing the patients to select their own DME supply company;

- Unlike legitimate retail DME companies, ALP Supply claimed to conduct its daily operations from locations that in some cases had no signage or that were shuttered with no indication that any business was conducted at that location; and/or

- Unlike legitimate retail DME companies, Vakula, through ALP Supply, entered into illicit relationships with the Wholesale Defendants, which, in exchange for kickbacks and/or a fee, provided ALP Supply with wholesale invoices that fraudulently inflated the price, quantity and/or item(s) provided, with the payments relating to such wholesale invoices, in some instances, actually serving as the vehicle through which Defendants laundered the money back to Vakula through the use of check cashing establishments.

76.     In these and numerous other ways, Defendants sought to deceive Plaintiffs into paying fraudulent claims that typically exceeded thousands of dollars per Claimant.

77.     The members of the ALP Supply enterprise alleged herein played well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs of the enterprises.

By way of example and not limitation, in furtherance of their scheme to defraud, on information and belief, Vakula engaged in one or more the following:

- Entered into kickback or other financial arrangements with No-fault Clinics, not named as defendants in this action, to (i) ensure that their HCPs prescribed large amounts of virtually identical DME and/or orthotic devices to their patient population, and/or (ii) fabricate and/or fraudulently alter/duplicate prescriptions issued by the HCPs, in order to conform the prescriptions to a predetermined course of treatment, irrespective of medical necessity;

- Entered into kickback or other financial arrangements with No-fault Clinics to ensure that the prescriptions provided were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone;

- Entered into kickback or other financial arrangements with No-fault Clinics to ensure that the prescriptions provided were sufficiently generic so that ALP Supply could unilaterally determine the DME and/or orthotic devices to be provided to patients and billed to insurers, in general, and Plaintiffs in particular;

- Entered into kickback or other financial arrangements with one or more of the Wholesale Defendants so that they would provide inexpensive DME and/or orthotic devices, along with fraudulent wholesale invoices that grossly inflated the amounts ALP Supply paid for the DME and/or orthotic devices;

- Submitted or caused to be submitted, on behalf of ALP Supply, numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to many Claimants;

- Submitted or caused to be submitted, on behalf of ALP Supply, prescription forms in support of requests for payment for DME and/or orthotic devices, which he knew to be fabricated and/or fraudulently altered/duplicated;

- Prepared or caused to be prepared fraudulent bills to be mailed to Plaintiffs; and/or

- Mailed or caused those acting under their direction to mail bogus claims to Plaintiffs, knowing that they contained materially false and misleading information.

78.     By way of further example and not limitation, in furtherance of their scheme to defraud, the Wholesale Owners, through the Defendant Wholesalers:

- Entered into kickback arrangements with Vakula, through ALP Supply, to provide inexpensive DME and/or orthotic devices, coupled with wholesale invoices that grossly inflated the cost and/or quantity of the DME and/or orthotic devices reflected therein;

- Entered into kickback arrangements with Vakula, through ALP Supply, to provide wholesale invoices that were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the item alone; and/or

- Prepared or caused to be prepared fraudulent wholesale invoices and sent them to ALP Supply, knowing that ALP Supply, in turn, would submit them to insurers in support of fraudulent claims for reimbursement.

79.   By way of further example, in furtherance of the scheme to defraud alleged herein, the Defendant Wholesalers:

- Provided inexpensive DME and/or orthotic devices, along with fraudulent wholesale invoices that grossly inflated the amounts ALP Supply paid for the DME and/or orthotic devices;

- Provided generic, non-descript wholesale invoices that deliberately omitted the make, model and/or manufacturer of the DME and/or orthotic devices to ensure that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the item alone;

- Provided the essential means through which Vakula was able to submit fraudulent bills to Plaintiffs for reimbursement of Non-Fee Schedule DME and/or orthotic devices under the No-fault Law;

- Knew or should have known that the inflated costs and/or quantities of the DME and/or orthotic devices reflected in the wholesale invoices they provided were materially misrepresented in the bills submitted by Vakula, through ALP Supply, to insurers;

- Knew or should have known that the generic, non-descript wholesale invoices they provided were used to materially misrepresent the nature, cost and quality of the DME and/or orthotic devices reflected in the bills submitted by Vakula, through ALP Supply, to insurers;

- Converted the checks they received from ALP Supply to cash and returned to a portion of the profits of the scheme through kickbacks or other financial compensation;

- Were oftentimes shell corporations, with no discernable, formal corporate structure or physical office space; and/or

- Claimed to conduct their daily operations from locations with no signage or that were shuttered with no indication that any business was conducted at that location.

80.     At all relevant times mentioned herein, the Wholesale Owners, either directly or through others acting under and pursuant to their direction, instruction and control, caused fraudulent wholesale invoices to be provided to ALP Supply, which they knew or should have known would be used by ALP Supply in furtherance of the scheme to defraud alleged herein.

81.     At all relevant times mentioned herein, the fraudulent wholesale invoices issued by the Wholesale Defendants provided the essential means by which Vakula, through ALP Supply, was able to further the scheme to defraud alleged in this Complaint.

82.     At all relevant times mentioned herein, the Wholesale Owners knew or should have known that the fraudulent wholesale invoices that were provided to ALP Supply through the Wholesalers would be used by ALP Supply to obtain payment from insurers, in general, and Plaintiffs, in particular, in connection with fraudulent claims.

83.     At all relevant times mentioned herein, Vakula knew that the wholesale invoices provided by the Wholesale Defendants were fraudulent in that they misstated the price, quantity and quality of the DME and/or orthotic devices purportedly sold to ALP Supply.

84.     At all relevant times mentioned herein, Vakula, through ALP Supply, directly or through others acting under and pursuant to their direction, instruction and control, submitted or caused to be submitted the fraudulent wholesale invoices provided by the Wholesale Defendants to Plaintiffs, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

85.     At all relevant times mentioned herein, Vakula and Wholesale Defendants, acting in concert with each other, participated in, conducted, controlled, conspired together, aided and

abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiffs, in particular, of money.

### THE MECHANICS OF THE SCHEME TO DEFRAUD

86.     On information and belief, beginning in August 2019 and continuing until the present day, Defendants and others not named in the Complaint have engaged in systematic fraudulent billing schemes based upon the alleged provision of DME and/or orthotic devices to No-fault Claimants.

87.     Vakula incorporated, owned and/or controlled ALP Supply for the purpose of defrauding insurers, in general, and Plaintiffs, in particular.

88.     On information and belief, ALP Supply, through Vakula, engaged in scheme to defraud, wherein Vakula: (i) paid kickbacks to the No-fault Clinics in exchange for prescriptions of DME and/or orthotic devices; (ii) obtained prescriptions that were provided pursuant to a predetermined course of treatment, without regard to medical necessity; (iii) obtained and submitted to insurers, in general, and Plaintiffs, in particular, prescriptions which they knew to be fabricated and/or fraudulently altered/duplicated; (iv) obtained fraudulently inflated wholesale invoices from the Wholesale Defendants that ALP Supply, in turn, would use to substantiate bogus claims for reimbursement of No-fault benefits and/or purchased counterfeit DME and/or orthotic devices from non-party wholesalers; (v) arranged for the No-fault Clinics to have assignments of benefits and acknowledgement of delivery receipt forms signed by Claimants on their behalf to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiffs, in particular; and (vi) systematically submitted bills to insurers, in general, and Plaintiffs, in particular, for DME and/or orthotic devices that were purportedly provided to Claimants based on medical necessity when, in fact, Vakula, through ALP Supply, determined the

DME that would be prescribed by the No-fault Clinics, with virtually every Claimant receiving a substantially similar battery of DME and/or orthotic devices.

89.     With ALP Supply in place, Defendants carried out their scheme to fraudulently bill insurers, in general, and Plaintiffs, in particular, for expensive DME and/or orthotic devices that were never provided, or if provided, were provided pursuant to fraudulent prescriptions based upon a pre-determined treatment protocol, irrespective of medical necessity, and further, were inexpensive items of inferior quality that cost a fraction of the amounts that Defendants materially misrepresented in their fraudulent bill submissions to Plaintiffs.

90.     Regardless of whether a No-fault Claimant was seen by a doctor on the date of the initial office visit at any of the unnamed No-fault Clinics operating in the New York metropolitan area, a No-fault Claimant's initial office consultation would automatically trigger a series of internal practices and procedures in which the No-fault Clinics, in exchange for kickbacks and/or other financial compensation agreements with ALP Supply, would issue a prescription for a standard battery of DME and/or orthotic devices, pursuant to a standard protocol or predetermined course of treatment and regardless of whether such items were medically necessary.

91.     Such prescriptions are issued for virtually every No-fault Claimant, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident.

92.     As part of the scheme to defraud described herein, pursuant to kickbacks or other financial compensation agreements with ALP Supply, the No-fault Clinics arranged for the fraudulent prescriptions to be issued to ALP Supply by: (i) causing their HCPs to write DME prescriptions in accordance with a pre-determined protocol; (ii) fabricating and/or falsifying DME prescriptions by photocopying or duplicating the HCPs' signatures onto new, blank prescription

forms, or altering the prescriptions, and filling in the prescription with expensive and unnecessary DME and/or orthotic devices; and/or (iii) ensuring that the prescriptions were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone.

93.     In furtherance of the scheme to defraud alleged herein, the prescriptions for DME and/or orthotic devices from the No-fault Clinics were forged by the mangers, owners and/or controllers of the Clinic. By way of example and not limitation, Exhibits "3," "4," and "5" in the accompanying Compendium of Exhibits are affidavits executed by three physicians, Azu Ajudua, M.D. ("Ajudua") and Barry Dublin, M.D. ("Dublin") in connection with an action captioned *Government Employees Insurance Co. v. Champ Medical Supply, Inc.*, Docket No. 16-cv-04823 (NG)(SMG) (E.D.N.Y. Aug. 29, 2016), and Shaikh Ahmed, M.D. ("Ahmed"), in connection with an action captioned *Government Employees Insurance Co. v. Lenex Services,* Docket No. 16-cv-06030 (LDH)(CLP) (E.D.N.Y. Oct. 31, 2016) in which the physicians acknowledge the fraudulent nature of the prescriptions that were generated by the No-fault Clinics, including the following:

- The purported signatures on the prescription forms submitted to insurers by DME retailers to support their claims are fraudulent, in that they are mere photocopies of the physicians' original signatures, affixed to bogus prescription forms;

- The physicians never prescribed much of the DME that appear on prescription forms with the physicians' signatures, which the DME retailers submitted to insurers in support of claims for reimbursement;

- Prescriptions for one or two DME which were written by the physicians were fraudulently altered, with as many as five to six additional DME added to the original prescription, by someone other than the physician;

- The types of equipment the physicians did prescribe for their patients (to the extent they prescribed any DME) were basic, inexpensive items, not the sophisticated and expensive items the DME retailers purportedly provided, and for which the DME retailers submitted bills and sought reimbursement; and

- The types of equipment the physicians did prescribe for their patients (to the extent they prescribed any DME) were inexpensive, flexible DME and/or orthotics intended to supplement a physical therapy regimen, whereas the devices the DME retailers purportedly provided, and billed for, were expensive, rigid items that would impede the prescribed physical therapy routine.

94. On information and belief, in furtherance of the scheme to defraud alleged herein, the use of multiple prescriptions bearing identical signatures is not an isolated incident unique to those non-parties involved in the affidavits, identified above.

95. By way of example and not limitation, Exhibit "6" in the attached Compendium of Exhibits is a representative sample of prescription forms submitted by ALP Supply and other DME supply companies not named in the Complaint in support of claims for reimbursement to Plaintiffs in connection with several Claimants, wherein the HCP's signatures on the prescriptions appear to be duplicated and/or photocopied.

96. In furtherance of the scheme to defraud alleged herein, the No-fault Clinics did not provide the No-fault Claimants directly with the prescriptions for DME and/or orthotic devices. Instead, these prescriptions were given directly to ALP Supply to eliminate the possibility that the No-fault Claimant(s) would fill the prescription(s) with a legitimate retailer of DME and/or orthotic devices.

97. In addition to arranging for fraudulent prescriptions, in exchange for kickbacks and/or other financial compensation agreements with ALP Supply, one or more No-fault Clinics operating in the New York metropolitan area often directed their HCPs to prescribe DME and/or orthotic devices that are not included in the Fee Schedule, such as bed boards, car seats, EMS Units, infrared heat lamps, massagers and whirlpools; and ensured that the prescriptions issued were generic and non-descript, omitting any detailed description of the items to be supplied to the No-fault Claimants.

98.     Similarly, as part of the kickback and/or other financial compensation agreements with the No-fault Clinics, the No-fault Clinics routinely provided ALP Supply with generic, non-descript prescriptions for certain Fee Schedule Items, such as back braces, knee braces, shoulder braces, ankle braces, cervical traction units, cervical collars, and lumbar cushions, which ALP Supply then used to unilaterally determine the DME provided to Claimants in purported fulfillment of the generic prescriptions, in order to bill for the most expensive type of DME and/or orthotic device and maximize reimbursement from insurers, in general, and Plaintiffs, in particular.

99.     By submitting a generic, non-descript prescription, devoid of any detail, in support of their claims for reimbursement, ALP Supply was provided the means through which they misrepresented the nature, quality and cost of the DME and/or orthotic devices allegedly prescribed and provided to No-fault Claimants.

100.    Furthermore, as part of the kickback or other financial compensation agreements with the No-fault Clinics and in furtherance of the scheme to defraud, on their first or second visit to the No-fault Clinic(s), the No-fault Claimants would be given a number of documents to complete and sign, including, but not limited to, assignment of benefit forms and one or more delivery receipts.

101.    In every instance, in furtherance of the scheme to defraud alleged herein, the delivery receipts describe the DME and/or orthotic devices in the same generic, non-descript manner as the prescriptions, claim forms, and wholesale invoices submitted by the ALP Supply in support of their claims for reimbursement.

102.    In furtherance of the scheme to defraud alleged herein, the delivery receipts submitted by ALP Supply to Plaintiffs routinely misrepresented the DME and/or orthotic devices provided.

103.    On information and belief, in furtherance of the scheme to defraud alleged herein, Vakula, through ALP Supply, purchased inexpensive DME and/or orthotic devices from wholesalers not named as defendants herein that were counterfeit or knockoffs of trademarked items made by other manufacturers. At all relevant times mentioned herein, ALP Supply knew that they could purchase the counterfeit items at a fraction of the cost of the actual, trademarked item.

104.    On information and belief, in furtherance of the scheme to defraud alleged herein, ALP Supply purchased the cheap DME and/or orthotic devices in bulk and routinely misrepresented the nature, quality and cost of the items in order to fraudulently obtain and maximize their reimbursement far in excess of the amounts they were entitled to receive under the No-fault Law.

105.    In other instances, in furtherance of the scheme to defraud alleged herein, ALP Supply entered into agreements with one or more of the Wholesale Defendants whereby one or more Wholesale Defendants supplied ALP Supply with invoices that were used to document false, inflated and outrageous wholesale costs, which ALP Supply then submitted to insurers, in general, and Plaintiffs, in particular, as part of their proof of claim.

106.    On information and belief, in furtherance of the scheme to defraud alleged herein, the wholesale invoices provided by one or more Wholesale Defendants to ALP Supply included artificially high prices that exceeded the actual wholesale price of the DME and/or orthotic devices reflected therein.

107.    To the extent ALP Supply provided any DME and/or orthotic devices to No-fault Claimants, the DME and/or orthotic devices were inexpensive items that were materially misrepresented in the wholesale invoices received from one or more Wholesale Defendants.

108.    On information and belief, the wholesale invoices provided by the Wholesale Defendants to ALP Supply reflected grossly inflated prices, in excess of 10 times the actual prices that the ALP Supply paid for the DME and/or orthotic devices when they were actually provided.

109.    On information and belief, in furtherance of the scheme to defraud alleged herein, each of the wholesale invoices provided by one or more Wholesale Defendants to the ALP Supply intentionally omitted the make, model, or manufacturer of the DME and/or orthotic devices reflected in the invoice, thereby ensuring that the nature and quality of the item that was supposedly provided could not be verified based on the wholesale invoice alone.

110.    In some instances, on information and belief, the DME and/or orthotic devices reflected in the wholesale invoices provided by one or more Wholesale Defendants to ALP Supply were never actually provided to the ALP Supply; rather, one or more Wholesale Defendants created and provided the wholesale invoices to ALP Supply to create the illusion of a sale.

111.    On information and belief, the wholesale invoices were provided to ALP Supply to camouflage the conversion of ALP Supply's checks payable to one or more Wholesale Defendants, which the Wholesale Defendants cashed at check cashing establishments or through other means.

112.    On information and belief, ALP Supply would issue checks to one or more Wholesale Defendants for the full amount of the inflated wholesale invoice.  The Wholesale Defendants would then convert the checks to cash through check cashing establishments, or by other means, and would return a substantial portion of the money to ALP Supply, keeping a portion of the profits of the scheme for themselves.

113.    On information and belief, in furtherance of the scheme to defraud alleged herein, ALP Supply requested that one or more Wholesale Defendants have their checks cashed on their

corporate accounts to fraudulently demonstrate to insurers, such as Plaintiffs, that they paid for the wholesale items when, in fact, they did not.

114.    In furtherance of the scheme to defraud alleged herein, ALP Supply routinely submitted fraudulent documents, including, but not limited to, claim forms, prescriptions, delivery receipts, and wholesale invoices that materially misrepresented the nature, quality and cost of the DME and/or orthotic devices purportedly provided to No-fault Claimants.

115.    The Wholesale Defendants and No-fault Clinics provided the means through which the Defendants were able to execute their scheme to defraud.

116.    In every instance, the wholesale invoices and prescriptions were provided with the knowledge that they would be submitted to insurers, in general, and Plaintiffs, in particular, to obtain reimbursement under the No-fault Law in excess of the actual permissible charge for the DME and/or orthotic devices purportedly provided.

117.    In furtherance of the scheme to defraud alleged herein, ALP Supply routinely submitted fraudulent bills seeking the maximum possible amount of reimbursement under the No-fault law for expensive DME and/or orthotic devices that were never actually provided or not provided as billed and/or, if provided, provided pursuant to a predetermined course of treatment, without regard to medical necessity.

118.    In many cases, ALP Supply never actually provided the DME for which they billed Plaintiffs.

119.    In furtherance of the scheme to defraud alleged herein, like the wholesale invoices, ALP Supply's bills intentionally omitted the make, model and manufacturer of the DME and/or orthotic devices purportedly provided to No-fault Claimants in order to conceal the fact that the

DME and/or orthotic devices purportedly provided were inexpensive and of poor quality, to the extent they were provided at all.

120.    In furtherance of the scheme to defraud alleged herein, upon receiving the wholesale invoices from the Wholesalers and/or other suppliers, ALP Supply, as a matter of pattern and practice, generated and submitted bills to Plaintiffs knowingly misrepresenting the type, quality, and cost of DME and/or orthotic devices purportedly purchased from the Wholesale Defendants and provided to Claimants.

121.    By way of example and not limitation, and as set forth in the "Non-Fee Schedule Scheme to Defraud" section below, Vakula, through ALP Supply, routinely submitted bills to Plaintiffs for Non-Fee Schedule items wherein ALP Supply misrepresented that: (i) certain DME and/or orthotic devices were reimbursable under the relevant Fee Schedule in existence at the time when, in fact, ALP Supply were utilizing phantom codes for which there was no published fee schedule; (ii) the charges reflected on ALP Supply's bills for Non-Fee Schedule items were the lesser of their acquisition costs or the usual and customary prices charged to the general public; and/or (iii) the Fee Schedule codes and descriptions contained in the ALP Supply's bills corresponded with the equipment purportedly provided.

122.    In addition, as set forth in the "Fee Schedule Scheme to Defraud" section below, Vakula, through ALP Supply, routinely submitted fraudulent bills to Plaintiffs  (i) in support of expensive DME and/or orthotic devices that required a customized fitting that they never performed; and/or (ii) which sought reimbursement rates under expensive fee schedule codes for DME and/or orthotic devices that the Retailer never actually provided.

123.    In furtherance of the scheme to defraud and to maximize reimbursement from Plaintiffs, virtually every bill submitted by ALP Supply deliberately obscured all identifying

information relating to the billed-for DME and/or orthotic devices so as to prevent Plaintiffs from determining the appropriate charges associated with any such DME and/or orthotic device or whether the specific DME and/or orthotic device was medically necessary.

124.     In furtherance of the scheme to defraud alleged herein, Vakula, through ALP Supply, routinely submitted fraudulent bills in support of expensive DME and/or orthotic devices that required a custom fitting and/or adjustment which they never performed.  By way of example and not limitation, Exhibit "7" in the accompanying Compendium of Exhibits is a representative sample of claims in which Vakula, through ALP Supply, billed for supports and/or braces that required fittings and adjustments which they never performed.

125.     Defendants' activity promoted and facilitated other acts that imposed costs onto Plaintiffs well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and peer reviews.

## THE NON-FEE SCHEDULE SCHEME TO DEFRAUD

## 1.     Fraudulent Billing Under Phantom Codes Not Recognized in the Fee Schedule

126.     In furtherance of the scheme to defraud alleged herein, Vakula, through ALP Supply, routinely submitted bills for Non-Fee Schedule items, wherein they misrepresented that those items were reimbursable under the Fee Schedule when, in fact, they were utilizing exact same phantom codes for the same items that were not listed on the relevant Fee Schedule in existence at the time. By way of example and not limitation, Exhibit "8" in the accompanying Compendium of Exhibits is a representative sample of claims in which ALP Supply submitted fraudulent bills for Non-Fee Schedule items to one or more Plaintiffs using phantom codes.

127.    By way of example and not limitation Vakula, through ALP Supply routinely submitted bills to Plaintiffs for "infrared lab with stand" units using phantom code E0205, which is not recognized in the Fee Schedule, in the amount of $210.12 notwithstanding that, to the extent any DME was provided, the infrared heat lamps purportedly provided were actually cheap, hand held heat lamps, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $20.00.   Exhibit "9" in the accompanying Compendium of Exhibits is a representative sample of claims wherein ALP Supply submitted fraudulent bills for a heat lamp to one or more Plaintiffs using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

128.    By billing under the phantom code for the heat lamp units Vakula, through ALP Supply, billed and were paid nearly *ten times* what they would otherwise have been entitled to receive, if anything, under the No-fault Law.

129.    Separate and apart from billing for the same heat lamps under a phantom code not recognized under the Fee Schedule, Vakula, through ALP Supply, routinely submitted bills for other Non-Fee Schedule items using phantom codes in which they materially misrepresented that the items were reimbursable under the relevant Fee Schedule in existence at the time and the amount they were entitled to receive.   By way of example and not limitation:

- Vakula, through ALP Supply, routinely submitted bills to Plaintiffs for "Water Circulating Heat Pad with Pump" using phantom code E0217, in the amount of $488.00, notwithstanding that, to the extent anything was provided, the water circulating units were cheap aqua relief systems reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $200.00. Exhibit "10" in the accompanying Compendium of Exhibits is a representative sample of claims where ALP Supply submitted fraudulent bills for a water circulation unit to one or more Plaintiffs using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

- Vakula, through ALP Supply, routinely submitted bills to Plaintiffs for TENS units and/or EMS Units, using phantom code E0745, in the amount of $350.00 notwithstanding that, to the extent anything was provided, the stimulator units are actually cheap "digital therapy machines" and/or TENS/EMS units, reimbursable, if at all, as Non-Fee Schedule items, for which the usual and customary price charged to the general public is no more than $30.00.  Exhibit "11" in the accompanying Compendium of Exhibits is a representative sample of claims where ALP Supply submitted fraudulent bills for stimulator units to one or more Plaintiffs using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

- Vakula, through ALP Supply, routinely submitted bills to Plaintiffs for "Bed Boards" using phantom code E0273 in the amount of $101.85, notwithstanding that, to the extent any DME was provided, the bed board purportedly supplied was an inexpensive, thin piece of foldable cardboard or other material, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $30.00. Exhibit "12" in the accompanying Compendium of Exhibits is a representative sample of claims where ALP Supply submitted fraudulent bills for bed boards to one or more Plaintiffs using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

130.    By submitting to Plaintiffs bills that contained phantom codes not recognized under the relevant Fee Schedule in existence at the time, Vakula, through ALP Supply, deliberately misrepresented that their bills reflected either a reimbursement amount set by the Fee Schedule, or alternatively that their bills reflected the lesser of their acquisition cost plus 50%, or the usual and customary price for the public, when in reality, to the extent anything was provided, the items did not have a Fee Schedule code and Vakula, through ALP Supply, were entitled to receive only a fraction of the amount reflected in their bills.

131.    Consequently, by submitting to Plaintiffs bills that contained phantom codes not recognized under the relevant Fee Schedule in existence at the time, Vakula, through ALP Supply, deliberately and materially misrepresented the amounts that they were entitled to receive and

deceived Plaintiffs, among others, into paying many times over what the No-fault Law would have otherwise allowed for medically necessary DME and/or orthotic devices.

132.    In addition to containing phantom codes that are not recognized under the relevant Fee Schedule in existence at the time, ALP Supply's bills routinely contained grossly inflated charges, supported by fraudulent wholesale invoices, where any wholesale invoices were supplied at all, for DME and/or orthotic devices that were inexpensive and of poor quality.

**2.    Fraudulent Billing Using Fee Schedule Miscellaneous Codes**

133.    In furtherance of the scheme to defraud alleged herein, Vakula, through ALP Supply, routinely submitted bills for Non-Fee Schedule items using Fee Schedule code E1399, which is reserved for miscellaneous items, and in doing so, they fraudulently misrepresented the nature and quality of the billed-for DME and/or orthotic devices and their acquisition costs. Exhibit "13" in the accompanying Compendium of Exhibits is a representative sample of claims in which ALP Supply submitted fraudulent bills for Non-Fee Schedule items to one or more Plaintiffs using Fee Schedule Code E1399.

134.    By way of example and not limitation, Vakula, through ALP Supply, routinely submitted bills to Plaintiffs for car seats using code E1399 in the amount of $95.00, falsely representing that that amount was the lesser of the usual and customary prices charged to the public or the Retailers' acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the car seats purportedly supplied were inexpensive bubble pads or other material for which the usual and customary price charged to the general public is not more than $13.00. Exhibit "14" in the accompanying Compendium of Exhibits is a representative sample of claims in which ALP Supply submitted fraudulent bills for car seats to one or more Plaintiffs using Fee Schedule Code E1399.

135.    By way of further example and not limitation, Vakula, through ALP Supply, routinely submitted bills to Plaintiffs for hydrotherapy whirlpools using code E1399, in the amount ranging of $446.50, falsely representing that this amount was the lesser of the usual and customary prices charged to the public or the Retailers' acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the whirlpools are inexpensive "jet spas," reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $45.00.   Exhibit "15" in the accompanying Compendium of Exhibits is a representative sample of claims in which ALP Supply submitted fraudulent bills for hydrotherapy whirlpools to one or more Plaintiffs using Fee Schedule Code E1399.

**3.     Fraudulent Billing of Non-Fee Schedule Items under Fee Schedule Codes**

136.    In furtherance of the scheme to defraud alleged herein, Vakula, through ALP Supply, routinely submitted bills to Plaintiffs for Non-Fee Schedule Items using codes reserved for Fee Schedule Items in order to maximize the fraudulent charges they could submit to Plaintiffs, despite the fact that they never provided the billed-for items.   By way of example and not limitation, Vakula, through ALP Supply routinely submitted bills to Plaintiffs for "egg crate mattresses," a Non-Fee Schedule Item which is nothing more than a thin, foam mattress *pad*, using Fee Schedule code E0272, which is reserved for a "Foam Rubber Mattress," reimbursable in the maximum amount of $155.52.

137.    ALP Supply never provided a Foam Rubber Mattress to any No-fault Claimant.

138.    To the extent any DME and/or orthotic device was provided, ALP Supply provided simple bubble mattress pads, which it described as an "egg crate mattress," for which the usual and customary price charged to the general public did not exceed $25.00.

139.    By submitting bills using code E0272, Vakula, through ALP Supply, materially misrepresented that they provided Foam Rubber mattresses when they did not, and also materially misrepresented that the item purportedly provided was a Fee Schedule item, seeking reimbursement in amounts upwards of seven times what would otherwise have been a permissible charge for the Non-Fee Schedule item.   Exhibit "16" in the accompanying Compendium of Exhibits is a representative sample of claims in which ALP Supply submitted fraudulent bills for egg crate mattresses to one or more Plaintiffs by billing for the Non-Fee Schedule DME under a Fee Schedule code.

### FEE SCHEDULE SCHEME TO DEFRAUD

**1.    Fraudulent Billing for Custom Fit DME and/or Orthotic Devices.**

140.    In furtherance of the scheme to defraud, Vakula, through ALP Supply, routinely submitted fraudulent bills in support of expensive pre-fabricated DME and/or orthotic devices that required a fitting and adjustment in which the device has been trimmed, bent, molded, assembled, adjusted, modified, or otherwise customized to fit a specific patient by an individual with expertise, which they never provided. *See* Durable Medical Equipment, Orthotics, Prosthetics and Supplies Policy Guidelines, New York State Department of Health (March 1, 2019), at 4; Durable Medical Equipment, Orthotics, Procedure Codes and Coverage Guidelines, New York State Dep't of Health (August 1, 2019), at 115.

141.    By way of example and not limitation, under the relevant Fee Schedule in existence at the time, the permissible charges for lumbosacral orthoses ("LSOs") range from $43.27, under code L0625 for basic, prefabricated LSOs dispensed off-the-shelf, to $1,150.00 under code L0632 for more complex LSOs that are custom fabricated.

142.     Vakula, through ALP Supply, routinely submitted bills for LSOs using codes reserved for prefabricated DME and/or orthotic devices that require a customized fitting, including, but not limited to L0627 and/or L0637, notwithstanding that a customized fitting was never performed. Exhibit "17" in the accompanying Compendium of Exhibits is a representative sample of claims where ALP Supply submitted fraudulent bills for LSOs to one or more Plaintiffs using codes L0627 and/or L0637.

143.     To the extent any DME and/or orthotic devices were provided, Vakula, through ALP Supply, provided cheap, one-size-fits-all LSOs for which no customized fitting was ever performed.

144.     Under the relevant Fee Schedule in existence at the time, the permissible charges for knee braces range from $65.00, under code L1830, for a prefabricated knee brace dispensed off-the-shelf, to $1,107.70, under code L1844, for more complex models that are custom fabricated.

145.     Vakula, through ALP Supply, routinely submitted bills for knee braces using codes L1810 and/or L1832, which are reserved for prefabricated DME and/or orthotic devices that require a customized fitting, which was never performed. By way of example and not limitation, Exhibit "18" in the accompanying Compendium of Exhibits is a representative sample of claims where ALP Supply submitted fraudulent bills for knee braces to one or more Plaintiffs using codes L1810 and/or L1832.

146.     To the extent any DME and/or orthotic devices were provided, Vakula, through ALP Supply, provided cheap, one-size-fits-all knee braces for which no customized fitting was ever performed.

147.    Under the relevant Fee Schedule in existence at the time, the permissible charges for a shoulder support range from $40.00, under code L3650, for a prefabricated shoulder support dispensed off-the-shelf, to $896.92, under code L3674, for more complex custom fabricated DME and/or orthotic devices.

148.    In furtherance of the scheme to defraud, Vakula, through ALP Supply, routinely submitted fraudulent bills for shoulder supports using code L3962 notwithstanding that a customized fitting was never performed.  Exhibit "19" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where ALP Supply submitted fraudulent bills for shoulder supports using code L3962.

149.    To the extent any DME and/or orthotic devices were provided, Vakula, through ALP Supply, provided cheap, one-size-fits-all shoulder supports for which no customized fitting was ever performed.

**2.      Fraudulent Billing of Cervical Traction Units**

150.    ALP Supply routinely submitted fraudulent bills to Plaintiffs for cervical traction units under Fee Schedule Code E0855.

151.    On information and belief, the cervical traction units purportedly provided by ALP Supply are inexpensive replicas or knockoffs of trademarked cervical traction units with a wholesale price that is a fraction of the cost associated with the authentic device. In that regard, to the extent anything was supplied to No-fault Claimants at all, ALP Supply provided basic, inexpensive cervical traction units pursuant to a predetermined course of treatment, based on generic prescriptions, regardless of medical necessity and misrepresented the nature, quality and cost of the items in each of the bills submitted to Plaintiffs.

152.   By billing cervical traction units under code E0855, Vakula, through ALP Supply, falsely represented that they provided expensive, medically necessary cervical traction units when in actuality they provided cheap, inexpensive items that in many cases were replicas or knockoffs of trademarked items.  By way of example and not limitation, Exhibit "20" in the accompanying Compendium of Exhibits is a representative sample of claims where ALP Supply submitted fraudulent bills for a cervical traction device to one or more Plaintiffs.

**3.       Fraudulent Billing for DME and/or Orthotic Devices Not Provided**

153.   In furtherance of the scheme to defraud alleged herein, Vakula, through ALP Supply, routinely submitted bills to Plaintiffs for DME and/or orthotic devices that were never provided.

154.   By way of example and not limitation, Vakula, through ALP Supply, routinely submitted fraudulent bills to Plaintiffs seeking reimbursement for "lumbar cushions" using code E2611 in the amount of $282.40, which they did not provide as billed, if anything was provided at all.  Exhibit "21" in the accompanying Compendium of Exhibits is a representative sample of claims where ALP Supply submitted fraudulent bills for lumbar cushions to one or more Plaintiffs under code E2611 in the amount of $282.40.

155.   Under the relevant Fee Schedule in existence at the time, code E2611 is reserved for DME satisfying the description of "Wheelchair Back Cushion," and is specifically reserved for support used in connection with a wheelchair.

156.   None of the No-fault Claimants who purportedly received a lumbar cushion or replacement cushion cover from ALP Supply, billed under code E2611 was wheelchair bound.

157.    To the extent any DME and/or orthotic device was provided, the lumbar cushions were not specialized wheelchair cushions, but rather simple back cushions for use in any chair that would otherwise be reimbursable under code E0190 at $22.04.

158.    By billing lumbar cushions under code E2611, Vakula, through ALP Supply, falsely represented that they provided specialized wheelchair cushions and/or covers, when they did not.

## MONEY LAUNDERING SCHEME

159.    Defendants knew that the money paid by insurers, in general, and Plaintiffs, in particular, to ALP Supply represented the proceeds and profits of their unlawful activity.

160.    To ensure that they would ultimately receive their ill-gotten gains, on information and belief, the Defendants engaged in a complex check cashing and/or money laundering scheme in furtherance of the scheme to defraud.

161.    These covert transactions were facilitated through various clandestine arrangements among one or more of the Retail Defendants, Wholesalers, check brokers (who acted as intermediaries between the check cashers and the Retail Defendants and one or more Wholesalers in order to conceal the true beneficiaries of the transactions) and check cashers.

162.    As described herein, on information and belief, ALP Supply and one or more Defendant Wholesalers generated significant amounts of cash through transactions with check cashers and/or other financial arrangements.  This cash was used to facilitate, among other things: (i) the secret cash kickback arrangements between ALP Supply and Wholesalers that were essential to foster the illusion that ALP Supply actually paid the inflated amounts for DME and/or orthotic devices reflected on the wholesale invoices; (ii) the secret cash kickback arrangements between ALP Supply and No-fault Clinics, which were necessary to induce the clinics to supply

ALP Supply with prescriptions for bogus DME and/or orthotic devices; and (iii) ALP Supply's and one or more Defendant Wholesalers' transactions, which were intentionally disguised as business expenses in order evade corporate tax liabilities through false deductions and/or the under reporting of income, thereby maximizing the Defendants' profits from, and enhancing their incentives to continue, the fraudulent activities described herein.

163.    As part of the scheme, one or more of the Defendants routinely presented numerous checks to check cashers that were structured in amounts slightly under the $10,000.00 floor that would have triggered compulsory reporting to the government.  These checks were: (i) payable to entities that maintained bank accounts, but had no apparent business or lawful purpose; (ii) payable to fictitious payees intended to conceal the true beneficiaries of the transactions; and/or (iii) presented by "brokers" who acted as intermediaries between the check cashers, ALP Supply and Wholesalers in order to conceal the true beneficiaries of the transactions.

164.    On information and belief, in exchange for a nominal fee, nearly all of the cash generated by the check cashing transactions involving the Wholesalers was returned to ALP Supply.  In particular, in furtherance of the scheme to defraud, to create the illusion that ALP Supply paid the grossly inflated prices on the invoices provided by one or more Wholesalers, ALP Supply issued checks to one or more Wholesalers, among others, for the full amounts reflected on the wholesale invoice(s).  ALP Supply used those checks to demonstrate to Plaintiffs, and others, that they paid the false wholesale invoice amounts and used the returned cash to pay kickbacks to, among others, the clinics that issued fraudulent and/or forged prescriptions for DME.

165.    In reality, on information and belief, one or more Wholesalers converted the checks they received from ALP Supply to cash and secretly returned cash to ALP Supply up to 98% of the wholesale invoice amounts.

166.     Through these transactions, ALP Supply was able to surreptitiously obtain cash, which in turn would be used to, among other things, pay kickbacks to the No-fault Clinics in exchange for prescriptions of DME and/or orthotic devices, and to the Wholesalers in exchange for inflated wholesale invoices, thereby maintaining a symbiotic relationship necessary to facilitate the scheme to defraud.

<u>**DISCOVERY OF THE FRAUD**</u>

167.     To induce Plaintiffs to promptly reimburse their claims for DME and/or orthotic devices, Defendants have gone to great lengths to systematically conceal their fraud.  By way of example and not limitation:

- Vakula, through ALP Supply, routinely and deliberately: (i) failed to submit wholesale invoices with their initial bill submissions, thereby concealing the amounts that ALP Supply actually paid for any DME and/or orthotic devices, the manufacturer, make, model, size and quality of the goods, and the actual value of the goods in a legitimate marketplace; or (ii) submitted fraudulent wholesale invoices from one or more of the Wholesalers, reflecting prices far in excess of those actually paid by ALP Supply, to the extent necessary to support the fraudulent charges;

- With respect to Fee Schedule Items, Vakula, through ALP Supply, routinely misrepresented in the bills submitted to Plaintiffs that they provided more expensive items from the middle or top end of the Fee Schedule, rather than the inexpensive, basic items that actually were supplied;

- Vakula, through ALP Supply, submitted false delivery receipts in support of their bills that purported to demonstrate the No-fault Claimants' receipt of the DME and/or orthotic devices, when, in actuality, the delivery receipts were routinely blank at the time the No-fault Claimants signed them;

- Vakula, through ALP Supply, systematically failed and/or refused to provide Plaintiffs with a meaningful description of the DME and/or orthotic devices (*i.e.*, make and model) purportedly provided to Claimants, and/or additional information necessary to determine whether the charges submitted by ALP Supply was legitimate.

168.    Plaintiffs are under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiffs in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent concealment described above, were designed to and did cause Plaintiffs to justifiably rely on them. As a proximate result, Plaintiffs have incurred damages of more than $53,600.00, based upon the fraudulent bill submissions.

169.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Plaintiffs, Plaintiffs did not discover and should not have reasonably discovered that their damages were attributable to fraud until shortly before they filed this Complaint.

## FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS VAKULA, ABC CORPORATIONS 1 THROUGH 5 AND JOHN DOES 1 THROUGH 5

## (RICO, pursuant to 18 U.S.C. § 1962(c))

170.    The allegations of paragraphs 1 through 169 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

171.    At all times relevant herein, ALP Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

172.    From, in or about July 23, 2019, through the date of the filing of this Complaint, Defendant Vakula, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, knowingly conducted and participated in the affairs of the ALP Supply enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud

described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

173.    At all relevant times mentioned herein, Defendant Vakula together with others unknown to Plaintiffs, exerted control over and directed the operations of the ALP Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

174.    On information and belief, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Vakula required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

175.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 5, through one or more of the ABC Corporations 1 through 5, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

## The Pattern of Racketeering Activity
### (Racketeering Acts)

176.     The racketeering acts set forth herein were carried out on a continued basis for more

than a year- period, were related and similar and were committed as part of the ongoing scheme of

Defendants Vakula, one or more of the ABC Corporations 1 through 5 and one or more of the John

Does 1 through 5 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if

not stopped, such acts will continue into the future.

177.     On information and belief, this pattern of racketeering activity poses a specific

threat of repetition extending indefinitely into the future, in as much as ALP Supply continues to

pursue collection on the fraudulent billing to the present day.

178.     As a part of the pattern of racketeering activity and for the purpose of executing the

scheme and artifice to defraud as described above, Defendant Vakula, with the knowledge and

intent of one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1

through 5, caused mailings to be made through the United States Postal Service in violation of 18

U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs

and to induce Plaintiffs to issue checks to the ALP Supply enterprise based upon materially false

and misleading information.

179.     Through the ALP Supply enterprise, Defendant Vakula submitted numerous of

fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly

(but not actually) provided to numerous of No-fault Claimants as billed. The bills and supporting

documents that were sent by Defendant Vakula, as well as the payments that Plaintiffs made in

response to those bills, were sent through the United States Postal Service. By virtue of those

activities, Defendants Vakula, one or more of the ABC Corporations 1 through 5 and one or more

of the John Does 1 through 5 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the ALP Supply enterprise through the filing of this Complaint.

180.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Vakula, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

181.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

182.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

183.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $53,600.00, the exact amount to be determined at trial.

184.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Vakula, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF

## AGAINST DEFENDANTS ALP SUPPLY AND VAKULA

### (Common Law Fraud)

185.    The allegations of paragraphs 1 through 169 are hereby repeated and realleged as though fully set forth herein.

186.    Defendants ALP Supply and Vakula made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company for payment.

187.    On information and belief, each and every bill and supporting documentation submitted by Defendants ALP Supply and Vakula to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

188.    On information and belief, Defendants ALP Supply and Vakula intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts ALP Supply was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME

and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- With respect to rented DME and/or orthotic devices, false and misleading statements that the items were (a) medically necessary when the items were the product of a predetermined protocol of treatment, designed to maximize the reimbursement in furtherance of a scheme to defraud without regard to the actual medical needs of the No-fault Claimants; and (b) that the maximum permissible monthly rental charge for such equipment, supplies and services provided on a rental basis did not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office, and did not exceed the amount allowed under the Fee Schedule;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a)  DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Vakula, through ALP Supply, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Vakula, through ALP Supply, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

189.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant ALP Supply's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

190.    Defendants ALP Supply and Vakula knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

191.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants ALP Supply and Vakula.

192.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant ALP Supply's claims for No-fault insurance benefits submitted in connection therewith.

193.    Furthermore, the far-reaching pattern of fraudulent conduct by Defendants ALP Supply and Vakula evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

194.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $53,600.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

**THIRD CLAIM FOR RELIEF**

**AGAINST DEFENDANTS ALP SUPPLY AND VAKULA**

**(Unjust Enrichment)**

195.    The allegations of paragraphs 1 through 169 are hereby repeated and realleged as though fully set forth herein.

196.    By reason of their wrongdoing, Defendants ALP Supply and Vakula have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

197.    Plaintiffs are therefore entitled to restitution from Defendants ALP Supply and Vakula in the amount by which they have been unjustly enriched.

198.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $53,600.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

**FOURTH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 5 AND JOHN DOES 1 THROUGH 5**

**(Aiding and Abetting)**

199.    The allegations of paragraphs 1 through 169 are hereby repeated and realleged as though fully set forth herein.

200.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company by Defendants ALP Supply and Vakula.

201.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants ALP Supply and Vakula purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants ALP Supply and Vakula could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Vakula, through ALP Supply, to ALP Supply to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through ALP Supply; and (v) knowingly supporting the negotiation and performance of kickback agreements between Vakula, through ALP Supply, and the No-fault Clinics.

202.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the

success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants ALP Supply and Vakula to obtain fraudulently inflated payments from Plaintiffs, among others.

203.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

204.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through ALP Supply in an amount to be determined at trial, but in no event less than $53,600.00.

205.    On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

206.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

**FIFTH CLAIM FOR RELIEF**

**AGAINST THE RETAIL DEFENDANTS**

**(Declaratory Judgment under 28 U.S.C. § 2201)**

207.    The allegations of paragraphs 1 through 169 are hereby repeated and realleged as though fully set forth herein.

208.    At all relevant times mentioned herein, each and every bill mailed by Vakula, through ALP Supply, to Plaintiffs sought reimbursement in excess of the amounts authorized by the No-fault Law and New York State Medicaid Fee Schedule by materially misrepresenting the DME and/or orthotic devices provided, if provided at all, as well as the cost and quality of the billed for DME and/or orthotic devices.

209.    To the extent the DME and/or orthotic devices were provided at all, each item was a basic, low-quality piece of medical equipment for which ALP Supply's wholesale cost was a mere fraction of the amount they charged Plaintiffs and/or was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

210.    At all times relevant herein, the Retail Defendants exploited the No-fault Law and New York State Medicaid Fee Schedule through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular, through the submission of fraudulent billing documents that misrepresented the nature, quality and cost of items that both are and are not listed on the relevant fee schedule purportedly provided to Claimants.

211.    In view of the Retail Defendants' submission of fraudulent bills to Plaintiffs, Plaintiffs contend that the Retail Defendants have no right to receive payment for any pending bills they have submitted because:

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs;

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME and/or orthotic devices that they never supplied to No-fault Claimants.

212.　As the Retail Defendants have knowingly made the foregoing false and fraudulent misrepresentations about the DME and/or orthotic devices purportedly supplied to No-fault Claimants and the amounts they were entitled to be reimbursed, which they never supplied to No-fault Claimants, in order to manipulate the payment formulas under the No-fault Law and New York State Medicaid Fee Schedule in their claims submissions and obtain reimbursement far in excess of the maximum permissible charges they were entitled to receive, it is respectfully requested that this Court issue an order declaring that the Retail Defendants are not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims and Plaintiffs, therefore, are under no obligation to pay any of Retail Defendants' No-fault claims.

213.　Plaintiffs have no adequate remedy at law.

214.　The Retail Defendants will continue to bill Plaintiffs for false and fraudulent claims for reimbursement absent a declaration by this Court that Plaintiffs have no obligation to pay the pending, previously-denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs demand judgment as follows:

i)      Compensatory damages in an amount in excess of $53,600.00, the exact amount to be determined at trial, together with prejudgment interest;

ii)     Punitive damages in such amount as the Court deems just;

iii)    Treble damages, costs and reasonable attorneys' fees on the First Claim for Relief, with prejudgment interest;

iv)     Compensatory and punitive damages on the Second Claim for Relief, with prejudgment interest;

v)      Compensatory damages on the Third Claim for Relief, together with prejudgment interest;

vi)     Compensatory and punitive damages on the Fourth Claim for Relief, with prejudgment interest;

vii)    Declaratory relief on the Fifth Claim for Relief, declaring that Plaintiffs have no obligation to pay any No-fault claims submitted by the Retail Defendants because (1) the Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs about the DME and/or orthotic devices purportedly supplied to No-fault Claimants and the amounts they were entitled to be reimbursed in order to manipulate the payment formulas under the No-fault Law and New York State Medicaid Fee Schedule in their claims submissions and obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs; and (2) The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs about the DME and/or orthotic devices purportedly supplied to No-fault Claimants by submitting claims for DME and/or orthotic devices that they never supplied to No-fault Claimants; and

viii)    Costs, reasonable attorneys' fees and such other relief that the Court deems just and proper.

Dated: New York, New York,
        July 13, 2021

                                   Morrison Mahoney LLP

                                   By:    /s/ Lee Pinzow        
                                       Robert A. Stern, Esq.
                                       Daniel S. Marvin, Esq.
                                       James McKenney, Esq.
                                       Lee Pinzow, Esq.
                                       Attorneys for Plaintiffs
                                     Wall Street Plaza
                                     88 Pine Street, Suite 1900
                                     New York, New York 10005
                                     (212) 825-1212

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY, ) X ) | CIVIL ACTION |
| ) | 21-CV-3536 |
| **Plaintiffs,** ) | (AMD)(RER) |
| -against- ) | COMPLAINT |
| ALP SUPPLY INC, PAL VAKULA, JOHN DOES 1 THROUGH 5, AND ABC CORPORATIONS 1 THROUGH 5, ) ) | (TRIAL BY JURY DEMANDED) |
| **Defendants.** ) X | |

---

**COMPLAINT**

---

**MORRISON MAHONEY, LLP**
**ATTORNEYS FOR PLAINTIFFS**
**WALL STREET PLAZA**
**88 PINE STREET, SUITE 1900**
**NEW YORK, NEW YORK 10005**
**TELEPHONE:  (212) 825-1212**